IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE



FILED
JAN 14 2021
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>AN IPHONE SMARTPHONE, PEACH IN COLOR WITH ANIMAL PRINT PROTECTIVE CASE, SEIZED FROM SHANIQA FLACK ON DECEMBER 2, 2020; A SAMSUNG SMARTPHONE, BLACK IN COLOR, IMEI 354212114728234, SEIZED FROM TOP DRESSER DRAWER OF SHANIQA FLACK'S BEDROOM ON DECEMBER 2, 2020, AS FURTHER DESCRIBED IN ATTACHMENT A | CASE NO. 3:20-MJ-2267 |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Rusty Aycocke, being duly sworn, state the following information to be true to the best of my knowledge, information and belief:

### INTRODUCTION

1. I began my career in law enforcement at the Blount County Sheriff's Office (BCSO) in 1994. I graduated from the Tennessee Law Enforcement Training Academy in 1995 and have successfully completed the State of Tennessee mandated in-service training each year since. I served as a patrol deputy from 1995 to 2009 and was assigned to the canine unit as a law enforcement canine handler from 1997 to 2009. During my twelve years as a canine handler, I handled two separate illegal drug detection canines and participated in hundreds of incidents relating to illegal drugs. In 2009 I was assigned as an investigator with the 5th Judicial Drug Task Force (5th JDTF) where I specialized in investigating illegal drug crimes. In 2015 I was assigned to the Federal Bureau of Investigation (FBI) High Intensity Drug Trafficking Area (HIDTA) Task

Force as a Task Force Officer (TFO) where I specialize in investigating complex and organized illegal drug crimes. I have served on the BCSO Special Weapons and Tactics (SWAT) Team since 1995. Currently, I continue to serve as an FBI HIDTA TFO and I also serve as the Commander for the BCSO SWAT Team.

2. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1). I participated in the investigations of persons suspected of various violations of state and federal law. Those state and federal investigations utilized seizure warrants, search warrants, and arrest warrants. I am familiar with the way criminals sell and deliver scheduled controlled substances, drug trafficking and possess firearms to further drug trafficking. I have received investigative training in drug trafficking, as well as criminal gangs and enterprises. I have participated in numerous arrests of known violent criminals and drug distributors. I am knowledgeable about the trends, practices, and indications of drug trafficking and gang activity and of those engaging in said criminal violations.

3. In addition, I have received training and have experience in the investigation of violations of the federal drug and money-laundering laws. As a result, I am familiar with matters including the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers. In addition, I am also aware that it is common for members of DTOs to possess firearms in furtherance of their drug trafficking activities. In addition, it is also common

to use electronic devices such as computers, cellular telephones, and other electronic means to communicate and store information relating to the DTO and the trafficking of drugs.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant authorizing the search of TARGET TELEPHONE 1 and TARGET TELEPHONE 2, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that TARGET TELEPHONE 1 and TARGET TELEPHONE 2 contain evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1), and 18 U.S.C. § 1956, as further described in Attachment B.

## PROBABLE CAUSE

5. I, along with other investigative agents, have been investigating the heroin and fentanyl trafficking of the Jonathan JONES DTO. JONES regularly obtains large quantities of heroin and fentanyl from his source of supply in Ohio, who is also JONES' cousin. Once JONES obtains the heroin and fentanyl from his cousin, JONES then distributes the drugs to his co-conspirators, including Jerry Cody LAWSON, James HOPKINS, Cayla HOPKINS, and Shaniqa FLACK, who in turn distribute it to others in exchange for cash. James HOPKINS and Cayla HOPKINS – both of whom have proven to be reliable sources of information – provided to law enforcement first-hand information of FLACK's participation in drug trafficking activity with JONES. JONES and FLACK are romantically involved. FLACK resides at 1823 Riverside Drive, Apartment 411, Knoxville, Tennessee (hereinafter "FLACK's residence"), and, as discussed below, has been assisting JONES in drug distribution while JONES is in jail.

3

6. On August 21, 2020, law enforcement executed a search warrant at the residence where JONES and LAWSON, both of whom are prior convicted felons, resided in Louisville, Tennessee. JONES possessed in his rented room, among other items: two loaded firearms, more than 200 grams of heroin and fentanyl, digital scales, and expensive jewelry, including a Rolex watch. LAWSON possessed in his rented room approximately four grams of heroin and a loaded firearm.

7. Not long after JONES' August 21, 2020, arrest, FLACK and JONES began communicating over recorded jail phones and jail email systems. The jail communications, which have occurred with regularity from late August – mid November 2020, demonstrate that FLACK was actively trafficking in controlled substances at JONES' direction. For example, during an August 29, 2020 call at 1928 hours, FLACK apprised JONES of how FLACK was selling narcotics. During the call, JONES and FLACK did a three-way call with JONES' cousin/drug supplier, and JONES told his cousin to provide further instruction to FLACK as to how to blend and package the narcotics for distribution. The previous day, at 1216 hours, FLACK and JONES had the following electronic communication exchange over the jail system:

> JONES: hope u aint letting trucker get over 14 to 7 hell no 14 for 10 7 for 5 thats it pleas dont lt hi get over

> FLACK: no he said you was doing 14 for 7 that's what he been getting but ima tell him he said it's different not the same stronger but ima just let your cousin deal with it cus it's to much for me I'll just wait until he come

> JONES: if he don't do 14 or 10 then fuck em its better an he tryna get over ima cuss his ass our for real or tell him go somewhere else

> FLACK: okay well soon as he calls ima tell him & I told him he know he owe you 200 I mentioned it the first day he came up buy yeah he only came twice donated 7 both times ain't dealing with it until ya cousin come help donate

Based on my training and experience, and my familiarity with this case, the above exchange involves a drug customer whom JONES and FLACK refer to as "trucker," and "donations" are code for money received in exchange for drugs. A similar text exchange occurred at 1138 hours on September 9, 2020:

> FLACK: But he about to bring it & come get the 7
>
> JONES: ok so he gone have money for everything right?
>
> FLACK: He said he appreciates you an he asking if he can get it bring donation back
>
> JONES: na he need to pay for half he been gone to long
>
> JONES: did u redo it an put it like i told u bae lmk what it is when u do please love
>
> JONES: an u can put 20 on mine so i can start calling u baby instead
>
> FLACK: okay about to put the money on there now & I did it it's two 27s and a 15
>
> JONES: I said 28 lol baby an ok thank u my love
>
> FLACK: I know what you said but I was tryna equal them all up lol and you welcome baby wyd
>
> JONES: nah babe dont do it like that do it like i said please its easier to keep up with love an what he say
>
> FLACK: It wasn't enough that's why I did it like that Hong
>
> JONES: it is enough make those both an whatever left just leave it by itself it doesn't have to b equal baby an lmk what he say an how much total in donations rn

Here again, JONES and FLACK discuss FLACK's acquisition of drug debts and JONES provides further instruction to FLACK regarding drug blending and packaging certain quantities of drugs for re-sale.

8. On November 24, 2020, Jonathan JONES, Jerry Cody LAWSON, James HOPKINS, Cayla HOPKINS, and Shaniqa FLACK were federally indicted for conspiring to distribute at least one kilogram of heroin and at least 40 grams of fentanyl. JONES and

5

LAWSON were also federally indicted for various substantive drug trafficking and firearms offenses.

9. On December 2, 2020, federal agents, attempting to execute the federal arrest warrant for FLACK, approached FLACK's residence and knocked on the door. As we waited for the door to open, I and another FBI agent smelled the odor of burnt marijuana emanating from inside FLACK's residence. An unidentified black male answered the door. When the door to the FLACK's residence opened, the odor of burnt marijuana grew unmistakably stronger. I asked the unidentified black male if Shaniqa FLACK was home, and the black male stated that FLACK was inside asleep in one of the rooms. Once I received this information, I stated from the threshold for FLACK to come out to us. FLACK emerged from a back room and I asked her if we could step inside her residence, to which FLACK responded, "yes." Once inside the FLACK's residence, I saw other adults on the couch in the living room. I asked FLACK for permission to search for other people inside the residence for safety purposes, to which FLACK responded, "yes." In conducting the safety sweep for people, I saw in plain view in FLACK's bedroom a plastic bag of marijuana on a cardboard box next to the bed. In light of the marijuana I saw in plain view, and in conjunction with my knowledge of FLACK's continuous drug trafficking in concert with JONES, I asked FLACK for consent to search her residence, to which FLACK responded, "no."

10. I then saw FLACK attempting to compose and send a text message on TARGET TELEPHONE 1. I instructed FLACK to put TARGET TELEPHONE 1 down but she initially refused to do so. I then retrieved TARGET TELEPHONE 1 and placed it in airplane mode so that it could not be remotely wiped.

6

11.     On December 2, 2020, I sought and obtained a federal search warrant for FLACK's residence. I, along with other agents, executed the warrant the same day and found substantial evidence of armed drug trafficking and money laundering. For example, FLACK's residence contained a loaded shotgun (this firearm had been previously reported as stolen from another individual), and inside FLACK's bedroom law enforcement found a metal safe that contained approximately one pound of heroin and nearly $14,000 in cash. Additionally, in same room, law enforcement found TARGET TELEPHONE 2. Pursuant to the warrant, TARGET TELEPHONE 1 and TARGET TELEPHONE 2 were seized but were not searched.

12.     Based upon my training and experience, it is common for criminals to possess multiple cellular phones on which they conceal evidence of unlawful activity. I know that criminals often utilize multiple cellular telephones to conduct their business and plan crimes; which in this case, is engaging in drug trafficking. I am also aware that cellular telephones provide criminals with mobile access and control over their illegal trade. They often utilize cellular telephones to communicate with one another in furtherance of their unlawful activities. I know that cellular telephones frequently retain information for long periods of time, including retaining call histories, text messages, voicemail messages, photographs, internet browser history, GPS location data, and other information that can be retrieved from the cellular telephone even long after the cellular telephone ceased to be used. If unused and unaltered, most data from cellular telephones can remain indefinitely. It is common for criminals to utilize multiple cellular telephones to further and conceal their ongoing criminal activity in an attempt to thwart law enforcement. Cellular telephones are best analyzed in an offsite environment where the appropriate equipment can be used to download the data from the cellular telephone and preserve a copy of the downloaded material for inspection. Based upon my training and

7

experience, as well as the evidence gathered to date, including the evidence described in this affidavit, I believe there is probable cause to believe evidence of drug trafficking conspiracy and money laundering conspiracy will be found on both TARGET TELEPHONE 1 and TARGET TELEPHONE 2.

## **TECHNICAL TERMS**

13. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a

8

separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    d.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can

9

work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

14. Based on my training, experience, and research, I know that cellular devices such as TARGET TELEPHONE 1 and TARGET TELEPHONE 2, may have capabilities that frequently include acting as a wireless telephone, digital camera, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of a crime, or point toward the existence of evidence in other locations. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

16. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how TARGET TELEPHONE 1 and TARGET TELEPHONE 2 were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on TARGET TELEPHONE 1 and TARGET TELEPHONE 2 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

11

g. The nature of cellular phone-related evidence requires forensic analysts to employ a variety of different techniques to search for, document, and obtain electronic evidence. The search procedure may include the following techniques (the following is a nonexclusive list, as other search procedures may be used):

i. examination of all of the data contained in the cellular telephone, and/or memory storage devices in the cellular telephone to view the data and determine whether that data falls within the items to be seized as set forth herein;

ii. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

iii. surveying various file directories and the individual files they contain;

iv. opening files in order to determine their contents;

v. scanning storage areas; and

vi. performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear.

17. Because this warrant seeks permission to examine only TARGET TELEPHONE 1 and TARGET TELEPHONE 2 which are already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

18.     In light of the foregoing, there is probable cause to search TARGET TELEPHONE 1 and TARGET TELEPHONE 2, as set forth in Attachment A, for evidence of drug trafficking, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and money laundering, in violation of 18 U.S.C. § 1956, as set forth in Attachment B.

Respectfully submitted,

_____
Rusty Aycocke
FBI Task Force Officer

Subscribed and sworn to before me on this 3rd day of December, 2020.

_____
H. BRUCE GUYTON
United States Magistrate Judge

# ATTACHMENT A
## Items to be Searched

TARGET TELEPHONE 1: an Apple iPhone, peach in color with an animal print protective case.



Page 1 of 2

## ATTACHMENT A
### Items to be Searched

TARGET TELEPHONE 2: a Samsung cellular smartphone, black in color, IMEI number 354212114728234.





Page 2 of 2

# ATTACHMENT B
## Items to be Seized

1. All records on TARGET TELEPHONE 1 and TARGET TELEPHONE 2 described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 1956, as follows:

   a. All communications, in whatever form, that relate to, further in any way, or constitute evidence of drug trafficking and/or money laundering, including all records related to those communications.

   b. All photographs, videos, audio recordings, and text messages that relate to, further in any way, or constitute evidence of drug trafficking and/or money laundering.

   c. All data, communications, information, and records, in whatever form that have any tendency to establish the physical location of TARGET TELEPHONE 1 and TARGET TELEPHONE 2.

   d. All data, communications, information, and records, in whatever form that establish the identity or location of individuals engaged in drug trafficking and/or money laundering.

2. Evidence of user attribution showing who used or owned the particular TARGET TELEPHONE 1 and TARGET TELEPHONE 2 at the time the electronically stored evidence described in this warrant was created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.